**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-CR-00333-001 |
| | ) | Hon. Anthony Trenga |
| | ) | Hearing Date: June 3, 2026 |
| | ) | |
| BIN HAO, | ) | |
| Defendant. | ) | |
| | ) | |

<u>**BIN HAO'S POSITION ON SENTENCING**</u>

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................... 3

BACKGROUND ...................................................................................................................... 4

   I.    From the Start, Mr. Hao Put Family Above Himself. ........................................................ 4

   II.   Mr. Hao Devoted Himself to His Daughter's Care and Children's Happiness.................. 4

   III.  Mr. Hao's Kindness and Generosity Go Beyond His Family. .......................................... 6

   IV.  Mr. Hao Founded Qidian, Which Profitably Invested in Metronomic's Real Estate
           Development Projects. ...................................................................................................... 7

   V.    Mr. Hao's Personal Challenges Impaired His Judgment.................................................... 8

   VI.   When Metronomic Collapsed, Mr. Hao Communicated with and Tried to Protect Qidian
           Investors, Despite Increasing Personal Strain.................................................................11

   VII.  Mr. Hao Continues to Rely on and Support His Family. ................................................ 12

   VIII.Mr. Hao's Kindness and Generosity Go Beyond His Family. ........................................ 14

DISCUSSION ........................................................................................................................ 14

   I.    The Sentencing Guidelines Provide for an Offense Level of 16, and a Sentence of 21 to
           27 Months, Which Would Be Disproportionate to the Severity of the Offense. The Court
           Should Vary Downward to Give an Appropriate Sentence............................................... 14

        A.    The loss enhancement table is arbitrary, unsupported by empirical data, and
               inapplicable to this case. .................................................................................... 15

        B.    The Court should vary downward because the number of victims enhancement
               overstates Mr. Hao's culpability............................................................................ 18

   II.   The Section 3553(a) Factors Warrant a Sentence of Probation. ..................................... 20

A.    The circumstances of the offense and Mr. Hao's characteristics support probation. 21

B.    Probation is a just punishment for this offense.....................................................30

C.    Probation will achieve deterrence, protect the public, and facilitate repayment. . 33

III.  The Court Should Not Impose a Fine. ...............................................................................35

CONCLUSION...............................................................................................................................36

CERTIFICATE OF SERVICE ......................................................................................................37

Bin Hao, through counsel, respectfully submits his Position on Sentencing. He requests that the Court impose a sentence of probation.

**INTRODUCTION**

In every case, the 18 U.S.C. § 3553(a) factors are significant, but in fraud cases—where "[t]he Guidelines place undue weight on the amount of loss involved"—they take on renewed importance. *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004). In this case especially, the Guideline's loss table fails to tell the whole story. Bin Hao founded Qidian to provide for his daughter, who suffered from a severe genetic condition and required constant care. He invested in Metronomic in good faith, after four years and millions of dollars in successful investments. When Metronomic's developments began to fail, he poured himself into protecting his investors: hiring multiple law firms, seeking new lenders, forgoing a salary, and draining his life savings.

Mr. Hao navigated this professional storm while under immense personal pressure. For his daughter's entire life, Mr. Hao spent near-sleepless nights as her primary caregiver. Just as Metronomic's developments began failing, he and his wife divorced. And a week before Metronomic filed for bankruptcy, his daughter died. Nevertheless, he was on a plane within the month to check on the developments, still trying to recover investors' money. This selfless spirit still animates his life, from his close relationship with his teenage children to the lullabies he sings each night to his unborn daughter.

Mr. Hao acknowledges that he violated the law by misappropriating investors' funds. But, as argued below, that misappropriation had no impact on the investments' ultimate failure. Taking into account his remorse, his efforts to mitigate investors' losses, and the profound personal

challenges and grief he experienced as Qidian collapsed, we respectfully submit that a sentence of probation is sufficient to meet the goals of sentencing.

## BACKGROUND

I.    **From the Start, Mr. Hao Put Family Above Himself.**

Mr. Hao was always taught to value family, hard work, and putting others first. Mr. Hao was born in Beijing in 1971, to parents who "sacrificed" and "made sure he and his brother went to the top two colleges in China." Presentence Report ("PSR"), ECF 18, ¶¶ 50–51. They "pushed [Mr. Hao] . . . to leave China and immigrate to the United States for better opportunities." PSR ¶ 51.

Heeding his parents' advice, Mr. Hao set off for America in 1996 to pursue graduate studies, accompanied by his college girlfriend Ashley Yuan. PSR ¶ 52. The two were briefly apart, but Mr. Hao relocated from Pennsylvania to Maryland to attend school alongside Ms. Yuan. PSR ¶ 52. After Mr. Hao earned a Master's degree, they both hoped to pursue business degrees. As Ms. Yuan remembers it, Mr. Hao "showed a selfless nature; because we could only afford for one of us to attend business school at a time, Bin insisted that I go first while he found work to support our family." Ashley Yuan Letter at 1, Exhibit A. He worked while she attended school and, when she graduated in 2002, he began to pursue a business degree of his own. PSR ¶¶ 52, 63. As he was finishing his degree, he and Ms. Yuan—now married—decided to start a family. PSR ¶¶ 52–53.

II.    **Mr. Hao Devoted Himself to His Daughter's Care and Children's Happiness.**

Gabby, their first child, "was born with Chromosome 16 duplication." PSR ¶ 53. That condition left her "non-verbal [and] unable to stand." *Id*. Until Gabby died in 2020, at just 16, her "cognitive development [ ] remained that of an infant." Yuan Letter at 1; *see* PSR ¶ 53. "She lived in near-constant pain," "required constant medical care and was frequently hospitalized." Yuan

4

Letter at 1. Help from nurses, when available, "was limited and barely covered the weekdays while [Mr. Hao and Ms. Yuan] worked." *Id.*; *see also* PSR ¶ 53. For Gabby's whole life, Mr. Hao was her "primary caregiver." PSR ¶ 53.

Just as his parents had sacrificed for him, Mr. Hao sacrificed for Gabby. During the day, Mr. Hao worked full time and "spent all of his time after work taking care of her." Yuan Letter at 1. This obligation meant taking her to weekly doctors' appointments and coordinating her care. *See* 2019 Email with Gabby's Nurse, Exhibit B; 2019 Text messages with Care Coordinator, Exhibit C.

But he carried the heavier burden at night. At the beginning of her life, Gabby was on a feeding tube, and Mr. Hao "took it upon himself to stay awake through the night to ensure the lines didn't get tangled or put her at risk." Yuan Letter at 1. When she no longer needed a feeding tube, Gabby "was never able to sleep for more than a few hours at a time" because of her chronic pain. *Id*. To "comfort her the moment she woke up," Mr. Hao slept "in her room or just outside the door" every night, even if a nurse was there. *Id*. "Gabby needed to know he was there to feel safe." *Id*. "Even at sixteen," she "found her greatest comfort in being held" and "would not go back to sleep without seeing Bin and resting on his chest." *Id*. at 1–2.

Mr. Hao endured 16 years of near-sleepless nights, not just for Gabby, but also for Ms. Yuan and their other children. By the time Gabby was six, the couple had another daughter, Sophia, and a son, ████ PSR ¶ 53. "Whenever [Ms. Yuan] tried to take over" Gabby's care "so [Mr. Hao] could sleep, he always refused." Yuan Letter at 1. He insisted he stay with Gabby, "[t]o shield [Ms. Yuan] from the weight of her suffering," and so Ms. Yuan could rest to "have the strength to go back to work [the] next day and care for [their] other children." *Id*. When Ms. Yuan woke up in the morning "to the sound of Gabby's painful cries," she would also "hear Bin already downstairs with

5

her. He would push her stroller through the family room and living room for hours, singing lullabies to soothe her." *Id.*

Despite the demands of caring for Gabby, Mr. Hao always found time for ███ and Sophia. "The moment he finished work, his focus shifted entirely to [the children]." *Id.* at 2. When Gabby was in less pain and could leave the house, he took the three of them to a local farm to see animals; when she couldn't, "[h]e invented silly games . . . ensuring they could still experience joy at home." *Id.* He would build forts between the couch and bookshelf, where he and ███ would "hide [ ] and read stories," and would "set[] up a mattress on the stairs so [███ and Sophia] could slide down while Gabby watched and laughed." *Id.* Ms. Yuan remembers this as "an incredibly difficult time," with the "rare, beautiful glimpse of normalcy that [Mr. Hao] fought to provide" his children. *Id.*

### III.    Mr. Hao's Kindness and Generosity Go Beyond His Family.

Mr. Hao's self-sacrifice is not limited to his family. "While he is extremely frugal with his own needs, he is remarkably generous toward others in need." *Id.* "Practical and modest," Mr. Hao prefers to put others first: "When people need help, whether it is offering his time, his resources, or his energy, he gives without hesitation." *Id.* "For example, when old friends came from China, he allowed them to stay with him for six months rent-free and even helped provide groceries, simply because he believed they needed support." *Id.* He has handed out provisions to the homeless at Christmas, supported his fiancée's friend through a difficult period, and when his fiancée's mother was sick, "prepared meals for her, took her to doctor's appointments, and looked after her with patience and respect." *Id.* at 1–2.

6

IV.    **Mr. Hao Founded Qidian, Which Profitably Invested in Metronomic's Real Estate Development Projects.**

"[T]errified of who would care for Gabby after [Mr. Hao and Ms. Yuan] were gone," in 2015, Mr. Hao founded Qidian LLC ("Qidian"), a real estate investment fund, "to ensure she would always be provided for." *Id.*; *see* PSR ¶ 67.

The roots of this case stretch back to that same year, when Qidian invested with a Florida-based developer, Metronomic Holdings, LLC ("Metronomic"). Qidian extended a one-year loan to Metronomic and, as expected, the money was returned with interest in a year. *See* 2015 Investment, Exhibit D. Mr. Hao was confident that Qidian's success with Metronomic would continue, so Qidian invested millions more in Metronomic developments, which was also returned with interest. Metronomic Investments, Exhibit E (showing returns on 2017 investments for multiple investors); Qidian Investor Spreadsheet, Exhibit F (same).

Mr. Hao promised investors that their funds would only be used for the specific projects in which they had chosen to invest. Though he originally segregated the money for each project, Qidian's administrative burdens quickly ballooned past Mr. Hao's control. By 2017, at the advice of an accountant, he had begun to pool the funds so they were easier to manage. PSR ¶¶ 16, 20. Mr. Hao did his best to honor his commitment to investors, keeping track of each investment's source and intended destination. *See* Qidian Investor Spreadsheet (tracking each investment, its amount, and its destination). Though Mr. Hao misappropriated $453,917.49, this misappropriation did not affect the success of the investments. Until 2019, Qidian investors profited from Metronomic's projects. *See* Metronomic Investments (showing investment returns in late 2018); Qidian Investor Spreadsheet (same).

### V.    Mr. Hao's Personal Challenges Impaired His Judgment.

In 2019, things began to fall apart, first for Mr. Hao and then for Qidian. That April, Mr. Hao and Ms. Yuan divorced under the strain of caring for Gabby and paying for her medical care. Then, in May, a group of Qidian loans came due and Metronomic failed to pay the investors. At Mr. Hao's urging, Metronomic's president—a man named Ricky Trinidad—sent a letter to Qidian investors explaining that repayments had been hampered by "re-financing multiple properties with a new lender," as well as "a change in government policies and permitting processes," which had caused "all [local] developers [ ] significant delays." *See* May 2019 Letter, Exhibit G. Mr. Trinidad promised that Qidian investors would be paid with interest in two months, by mid-July. *Id*.

Mr. Hao was concerned but hopeful. He knew Metronomic's senior lender had paused funding on the project, but Mr. Trinidad assured him he was refinancing the project with a new institutional lender. To verify those assurances and ensure construction continued, Mr. Hao traveled to Florida twice a month, as he had through the life of the projects.

With the July deadline looming, Mr. Hao emailed Mr. Trinidad to underscore the stakes of Metronomic's delays. He explained that "[f]or me, investors are first," and that Metronomic's issues were taking away time from his family: "It is close to the summer time, I already arrange time for kids." June 2019 Email at 1, Exhibit H. He emphasized that he had used $165,000 of his own money to cover interest payments Metronomic owed to investors:

> I use my own fund to cover the interest payments to investors. I told you many times. I had to dig it myself because I know you have financial difficulties. For example, this month my accountant told me that I have to pay the investors $165K on behalf of Metronomic . . . . Besides I had no income (the fees from you), I have to run my company and cover all expense from my own pocket.

*Id*.

By this point, he started to suspect that Metronomic's problems ran deeper and began badgering Mr. Trinidad for updates. *See* July 17, 2019 Emails at 1, Exhibit I ("Please get this done.

8

Use some of the people you hired."); *id.* at 1 ("I haven't heard back from you since Wednesday. Would you please provide an update with any progress?"); July 23, 2019 Emails at 1, Exhibit J ("I will be in Miami on Tuesday August 6th. Please focus on close the construction loan asap and have a plan beforehand for the Mezz refinance. BTW, Have you read the email I sent to your [sic] previously?").

Mr. Trinidad batted away Mr. Hao's suspicions, insisting that Mr. Hao stop questioning him and put his faith in Metronomic:

> You don't need to ride me like a horse. . . . Stop yelling at me so much by email and telling me what to do. . . . Why do you keep riding me? I don't like this approach or you questioning my sincerity, hard work, commitment or my word. I will always stick to my word as long as it's within the realm of possibility. I have always told you that I will push hard to make this happen, that you have my commitment, that I will do my best with the timing, THAT'S MY WORD AND MY PROMISE, NOTHING MORE!

*Id.* at 1–2.

Over time, however, Mr. Hao's suspicions proved correct. In October, he learned that Mr. Trinidad had saddled the project with additional debt. Metronomic Counterclaim at 11, Exhibit K. And in January 2020, he learned Metronomic and its senior lender had sued one another, further hampering the project. Metronomic Attorney Letter at 1, Exhibit L.

Still, Mr. Trinidad repeatedly guaranteed that he could right the ship, refinance the project, and ultimately repay Qidian investors. *See* June 2019 Email at 1 ("After we close the re-capitalization, we will replace your mezz position with a preferred equity lender. We have 3 local companies that are interested in this; however, the projects must have construction financing before we begin their financing process."); July 17, 2019 Email at 2 ("I have other back ups that can place second mortgages and/or mezz positions to payoff your $6.3MM after we close. I haven't been able to find anyone that will take this position without construction financing in place."); July 23, 2019 Email at 2 ("I already said we're focussing [sic] on the recapitalization loan. OF COURSE

9

WE ARE!"); August 2019 Email, Exhibit M ("We will pay interest through the closing date as promised, and we will make our best efforts to close as soon as possible."); November 2019 Email, Exhibit N ("I understand better what's happened now. I've never financed a $28MM portfolio construction loan. It's too big for local private lenders, and too small for hedge funds, investment bankers and institutional lenders.").

Mr. Hao believed him. It does not take a trained psychologist to see that this lapse in judgment stemmed largely from the major stressors in Mr. Hao's life. The entire time he managed Qidian, he slept only a few hours each night. Just one month before Metronomic began its collapse, Mr. Hao and his wife had divorced. PSR ¶ 53; Yuan Letter at 1. He then balanced flying to Florida twice a month with his parenting duties, coordinating Gabby's care during the day while continuing to serve as her primary caregiver through sleepless nights. *See* 2019 Email with Gabby's Nurse ("I just came back from traveling and found Gabby's medication need to be refilled. She only have 2 day supplies. It is kind of urgent.").

And while Mr. Hao's trust in Mr. Trinidad proved to be badly misplaced, there was some basis for it, given Qidian's years of successful investments in Metronomic. There was also a more personal reason: Mr. Trinidad's son has a condition similar to the one Gabby had. September 2020 Email, Exhibit O ("You know that ▮▮▮▮▮ has a similar condition."). Their conversations about their children resonated with Mr. Hao. *See* September 2019 Email, Exhibit P ("[W]e had an emergency with ▮▮▮▮ It was a very serious situation because his heart stopped twice.").

Indeed, Mr. Hao's "greatest flaw," according to those who know him best, is his "tendency to trust others more than he should." Yuan Letter at 2. Mr. Hao can be generous to a fault, letting others "take[] advantage of his kindness." Vicki Zhang Letter at 2, Exhibit Q. As Ms. Yuan put it,

Mr. Hao "assumes everyone operates with the same good intentions he possesses, which led him to ignore warning signs" with Mr. Trinidad and Metronomic. Yuan Letter at 2.

**VI.     When Metronomic Collapsed, Mr. Hao Communicated with and Tried to Protect Qidian Investors, Despite Increasing Personal Strain.**

Unfortunately, these warning signs foreshadowed Metronomic's collapse. In May 2020—after a year of emails and Mr. Hao's trips to Florida—Mr. Trinidad finally admitted that he would not be able to refinance the projects. He formally admitted Metronomic was in default and granted Qidian a majority interest in the unfinished developments. December 2020 Email to Investors at 3, Exhibit R. Soon afterwards, Metronomic filed for bankruptcy, listing Qidian as its largest unsecured creditor, with a claim over $35 million. *Id.*; Bankruptcy Filing at 1, Exhibit S.

Although Mr. Hao had fallen prey to Mr. Trinidad's promises, he was transparent with investors about Metronomic's problems. When Metronomic began missing payments, he convinced Mr. Trinidad to write them letters describing Metronomic's host of issues. *See* May 2019 Letter; February 2020 Letter, Exhibit T. In conference calls with investors, Mr. Hao explained these problems himself. *See* December 2020 Email to Investors at 2.

Mr. Hao also used his own money to stanch the bleeding, covering Metronomic's missed interest payments. He stopped drawing a salary in January 2020 and, soon afterwards, started driving for Uber at night to devote himself to Qidian during the day. February 2021 Letter at 6, Exhibit U. In Ms. Yuan's words, "When the business began to fail, Bin did not try to save himself; instead, he used our entire family savings [to] try to save the projects, hoping to turn things around and protect his investors from loss." Yuan Letter at 2.

His efforts continued unabated after Metronomic filed for bankruptcy. He hired one law firm to represent Qidian in the bankruptcy case and another to sue Mr. Trinidad personally, contributing his own money to the retainer. December 2020 Email to Investors at 3; June 2021

11

Email to Investors at 2, Exhibit V ("We have engaged Jim Bacon from Allred, Bacon, Halfhill & Young (ABHY Law) to be the lead legal counsel."); Payment Receipt, Exhibit W. He sought out a new institutional lender to take over and finish the Metronomic developments. December 2020 Email to Investors at 3–4. And, as he had throughout the process, he kept investors apprised of all his efforts through conference calls and emails. *See* December 2020 Email to Investors at 2 (recapping history of Qidian's issues); February 2021 Email at 8–9 (same).

Mr. Hao poured himself into protecting investors even as the weight of his personal life bore down more heavily. During this period, ███████████████████████ ██████████████████. He filed for personal bankruptcy. PSR ¶ 72. And, just one week before Metronomic filed its own bankruptcy case, his daughter Gabby died in his arms. September 2020 Email. Still hoping to save investors' money, he took a flight to Florida after the funeral, to meet with Mr. Trinidad. *Id*. ("I am heart broken and am recovering from this loss. . . . I will come to Miami later this week after the funeral.").

Mr. Hao's doggedness on behalf of investors, despite his own deteriorating health and burdens as a father, was consistent with how he'd lived for years. As Ms. Yuan remembers it, "For many years, Bin's life consisted only of work and the children; nothing else existed for him." Yuan Letter at 2. "[D]espite years of absolute exhaustion" in caring for Gabby, Mr. Hao "never call[ed] out" from work. *Id*. at 1. He would "pac[e] around [the] kitchen island with Gabby held tightly in one arm while managing his work calls with the other." *Id*. at 2.

## VII. Mr. Hao Continues to Rely on and Support His Family.

Amidst the end of his marriage, the death of his daughter, and the collapse of his career, Mr. Hao has sought to rebuild his life.

Mr. Hao is still finding his footing professionally. He was unemployed for about three years, and a settlement with the SEC has permanently barred him from serving as an officer or director of certain SEC-regulated entities.[1] He currently works at the school where Ms. Yuan serves as the financial director, ordering and delivering food for the cafeteria and making about $1,000 per month. PSR ¶¶ 52, 65, 73.

Despite their divorce, he and Ms. Yuan remain on good terms. *See* Yuan Letter at 2 ("I want the court to know that Bin is a kind, hardworking man."). He lives in an apartment the school provided for Ms. Yuan, where she lives down the hall with her new partner. PSR ¶ 54. When Ms. Yuan was treated for breast cancer, the two amicably coparented their children. PSR ¶ 52.

Mr. Hao remains a devoted father to ███ and Sophia. He and ███ bond over tennis and a shared love of movies. Yuan Letter at 2. Sophia, who is headed to Northwestern University in the fall, lives with Mr. Hao in his one-bedroom apartment—she takes the bedroom, and Mr. Hao sleeps on the couch. PSR ¶ 54. When she works a late shift at a restaurant after school, he waits for her to drive her home. Yuan Letter at 2. When Mr. Hao and his children "are apart, they exchange 'good night' and 'I love you' messages every night." Zhang Letter at 2.

Mr. Hao is also in a committed five-year relationship with Vicki Zhang, and the two have a child due this August. Zhang Letter at 2; PSR ¶ 55. They plan to get married when this case finishes. PSR ¶ 55. In Ms. Zhang's eyes, he is "one of the most kindhearted, thoughtful, and responsible individuals I have ever met," consistently proving that "he puts others before himself." Zhang Letter at 1. "No matter how exhausted," he helps Ms. Zhang "navigat[e] the physical and emotional challenges of pregnancy," making "sure [her] home [is] always stocked with everything

---

[1]    Mr. Hao did not admit to any of the allegations against him in the SEC case. *See* Securities and Exchange Commission, *Bin Hao and Qidian LLC* (last visited Apr. 22, 2026), https://www.sec.gov/enforcement-litigation/litigation-releases/lr-26500.

[ ] needed; food, milk, prenatal supplies." *Id*. "Every night, no matter how long the day he had, he sings . . . to [their] baby girl from outside of the womb." *Id*. at 2.

## VIII.    Mr. Hao's Kindness and Generosity Go Beyond His Family.

Mr. Hao's self-sacrifice is not limited to his family. "While he is extremely frugal with his own needs, he is remarkably generous toward others in need." *Id*. "Practical and modest," Mr. Hao prefers to put others first: "When people need help, whether it is offering his time, his resources, or his energy, he gives without hesitation." *Id*. "For example, when old friends came from China, he allowed them to stay with him for six months rent-free and even helped provide groceries, simply because he believed they needed support." *Id.* He has handed out provisions to the homeless at Christmas, supported his fiancée's friend through a difficult period, and when his fiancée's mother was sick, "prepared meals for her, took her to doctor's appointments, and looked after her with patience and respect." *Id*. at 1–2.

## DISCUSSION

## I.    The Sentencing Guidelines Provide for an Offense Level of 16, and a Sentence of 21 to 27 Months, Which Would Be Disproportionate to the Severity of the Offense. The Court Should Vary Downward to Give an Appropriate Sentence.

The parties agree that the Sentencing Guidelines give an offense level of 16. The resulting sentence would be excessively severe, however, and the Court should vary downward accordingly.

Mr. Hao has pleaded guilty to wire fraud, in violation of 18 U.S.C. § 1343, which has a base offense level of 7. U.S.S.G. § 2B1.1(a)(1). The parties have agreed to a loss value of $453,917.49, increasing the offense level by 12. *Id.* § 2B1.1(b)(1)(G). Mr. Hao no longer disputes that there were at least ten victims, leading to an increase of 2 points. *Id.* § 2B1.1(b)(2)(A)(i). Mr. Hao has fully accepted responsibility by pleading guilty and timely notifying authorities of his intention to do so, reducing the offense level by 3. *Id.* § 3E1.1. The

14

government concedes that Mr. Hao meets all of the criteria for a zero-point offender adjustment, which reduces the offense level by 2. *Id.* § 4C1.1.[2] Given Mr. Hao's lack of criminal history, the resulting advisory guideline range is 21 to 27 months. U.S.S.G. Ch. 5, Pt. A.

That sentence, however, substantially overstates the severity of Mr. Hao's conduct and the facts of this offense. The loss enhancement is widely recognized as illogical and unjust, even in typical fraud cases, and doubly so in unusual cases like this one. And the number of victims enhancement, although technically applicable, has no purchase here. The harm to investors was caused not by the misallocation of their funds, but by the investments' failure and despite Mr. Hao's concerted efforts. The Court should impose a below-guideline sentence to reflect the case before it.

> **A.** **The loss enhancement table is arbitrary, unsupported by empirical data, and inapplicable to this case.**

Under the Sentencing Guidelines, "[t]here is a 'mechanical correlation between loss and offense level.'" *United States v. Stavrakis*, Crim. No. ELH-19-0160, 2025 WL 2897668, at *3 (D. Md. Oct. 9, 2025) (quoting *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005)). Even in a typical fraud case—which this case is not—that outcome "do[es] not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime." *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018); *see Stavrakis*, 2025 WL 2897668, at *3 ("[T]he amount

---

[2]    The probation office disagrees with the government and the defense's joint position on the zero-point offender adjustment. It based this disagreement on the victim impact statements, *see* Discussion II.A.6, including "substantial financial hardship" to "Victim J.D.," who— according to probation—could not work and had to move to Minnesota. PSR at 18–19. Probation appears to have conflated two different victims using the pseudonym J.D. *See* PSR ¶ 27 ("J.D. was no longer able to work, and *his* wife had to quit her job to care for *him*. . . . Victim J.D. and *her* family had to move from California to Minnesota.") (emphasis added).

of loss is an arbitrary metric to measure misconduct."); *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) ("[The Guidelines] tend to place great weight on . . . [the] amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors."); *Emmenegger*, 329 F. Supp. 2d at 427 ("The Guidelines place undue weight on the amount of loss involved in the fraud.").

This overseverity was baked in from the start. When drafting the fraud Guidelines, the Sentencing Commission "chose to exclude from its analysis fifty percent of the total data—every sentence in which a judge had issued a sentence of probation." Barry Boss & Kara Kopp, *How the Economic Loss Guideline Lost its Way, and How to Save It*, 18 Ohio St. J. Crim. L. 605, 609 (2012) (citation omitted). With the remaining fifty percent of the data, the Commission ratcheted up the effect of loss, providing for significantly longer sentences than were supported by past practice. *See id.* ("[T]he Commission . . . chose to recommend more severe sentences than the mean sentences of incarceration reflected in the remaining 50 percent of empirical data it considered."); Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 19 (2013) ("The influence of loss was not limited to the relatively modest role identified by the past practice study, however.").

Over time, the loss enhancement has grown even harsher and less empirically supportable.[3] *United States v. Corsey*, 723 F.3d 366, 379–80 (2d Cir. 2013) (Underhill, J., concurring)

---

[3] Though the enhancement is slated for amendment later this year, the adjustment accounts only for inflation, not for the enhancement's real issue. U.S. Sent'g Comm'n, *Amendments to the Sentencing Guidelines (Preliminary)* 13 (Apr. 16, 2026), https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202604_prelim-RF.pdf. In any case, the amendment will not change the advisory sentencing range here.

(describing how multiple amendments "have effectively multiplied several times" the original loss enhancement table, "which itself was set higher than historic sentences"). The enhancement's lack of empirical support further undermines the respect it is due. *Id.* at 379 (Underhill, J., concurring) ("The loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices[,] . . . [so] district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides."); *see also United States v. Nolasco-Ramirez*, 391 F. App'x 309, 311 (4th Cir. 2010) (holding courts are "free to consider . . . the presence or absence of empirical data" supporting the Guidelines).

Courts have long recognized this anomaly in the Guidelines. "Many in the legal community," including "judges, practitioners, scholars, and other commentators," therefore "have urged the Sentencing Commission to right this grievous wrong." *Johnson*, 2018 WL 1997975, at *4; *see United States v. Fry*, 792 F.3d 884, 893 (8th Cir. 2015) (Bright, J., dissenting in part) ("Many courts and commentators state the Guidelines related to fraud convictions do not present a reasonable starting point for sentencing.").

Fortunately, the Court need not accept the loss table at face value. "[D]istrict judges are as free to disagree with the policy behind the loss amount enhancement as they are with any other guideline." *United States v. Moose*, 893 F.3d 951, 959 (7th Cir. 2018); *see* Derick R. Vollrath, *Losing the Loss Calculation: Toward a More Just Sentencing Regime in White-Collar Criminal Cases*, 59 Duke L. J. 1001, 1035 (2010) ("[A]ppellate courts are upholding the decisions of sentencing judges who, based on policy concerns, apply *Kimbrough* to deviate from the white-collar crime Guidelines."); *see also Spears v. United States*, 555 U.S. 261, 264 (2009) (recognizing "district courts' authority to vary from the . . . Guidelines based on *policy* disagreement with them,

17

and not simply based on an individualized determination that they yield an excessive sentence in a particular case") (emphasis in original); *United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2010) ("[D]istrict courts may 'vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines.'") (quoting *Kimbrough v. United States*, 552 U.S. 85, 101 (2007)).

Courts have thus regularly exercised their discretion to vary downward in fraud cases. *See United States v. Faulkenberry*, 759 F. Supp. 2d 915, 928 (S.D. Ohio 2010) ("As has become common among district courts sentencing white-collar offenders in financial fraud cases, the Court finds that the loss calculation substantially overstates the gravity of the offense here and declines to impose a within-Guidelines sentence."), *aff'd*, 461 F. App'x 496 (6th Cir. 2012); *see also, e.g.*, *United States v. Prosperi*, 686 F.3d 32, 44 ("[S]everal factors played into the court's decision to treat the loss amount as an unfair proxy for culpability. . . . [T]he district court offered a plausible explanation of its refusal to allow the loss estimate to control its sentencing determination."); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (imposing 24-month sentence when guideline range was 78–97 months); *Adelson*, 441 F. Supp. 2d at 507–09 (imposing 42-month sentence when Guidelines "called for . . . life imprisonment").

The loss enhancement does not logically apply to an ordinary fraud case, and this is no ordinary case, as the amount Mr. Hao misappropriated is totally independent from the harm suffered by investors. He thus asks the Court to recognize the flaw in the Guidelines and vary downward to an appropriate sentence.

B.    **The Court should vary downward because the number of victims enhancement overstates Mr. Hao's culpability.**

Mr. Hao acknowledges that, formally, every investor whose funds he misappropriated is considered a victim. *See United States v. Bartko*, 728 F.3d 327, 346 (4th Cir. 2013) ("If one's

18

money is combined with other funds . . . then each individual or entity who contributed to the total loses a pro-rata share of her contribution. And . . . they are a victim pursuant to U.S.S.G. § 2B1.1(b)(2)(B).”). Therefore, Mr. Hao must admit that the offense involved more than ten victims, at least as a legal matter. Yet enhancing his sentence on that basis would make no sense.

“[T]he number-of-victims enhancement ‘punishes the impact of the crime . . . .’” *United States v. Anderson*, 532 F. App’x 373, 379 (4th Cir. 2013) (quoting *United States v. Lyles*, 506 F. App’x 440, 447 (6th Cir. 2012)). Like the loss value, however, the number of victims is irrelevant to that impact. Investors suffered because Metronomic went bankrupt and their investments failed. The number of victims played no role in that bankruptcy; of the nearly $40 million invested, barely 1% was misappropriated. In fact, the investors who contributed misallocated funds may well have withdrawn their investment successfully.

Neither does a larger number of victims represent greater misconduct. This is not a typical case, in which a fraudster intentionally seeks out more victims to contribute funds he can embezzle. *See, e.g.*, *Bartko*, 728 F.3d at 333 (“None of [the money] was used for investments or loans. . . . Hollenbeck forged the signatures of the investors on the checks and embezzled the proceeds. . . . [W]ith the exception of one individual, no refunds were actually made to the investors.”). Rather, Mr. Hao sought out additional investors for legitimate business reasons, and used the overwhelming majority of funds for investment purposes. He then put great effort into protecting investors’ interests.

“If a sentencing court concludes that a two-point adjustment is too harsh . . . the proper course is to apply the enhancement and then depart downward.” *United States v. Robinson*, 744 F.3d 293, 301 (4th Cir. 2014) (citing *United States v. Kimberlin*, 18 F.3d 1156, 1160–61 (4th Cir. 1994)). The Court should vary downward to counteract the two-level enhancement.

19

**II.    The Section 3553(a) Factors Warrant a Sentence of Probation.**

There is no presumption of reasonableness attached to the Sentencing Guidelines. *See Nelson v. United States*, 555 U.S. 350, 352 (2009). They serve only as a "starting point and initial benchmark" of a just sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). Under section 3553(a), the Court must also consider facts that would support varying below the Guidelines. *See generally* 18 U.S.C. § 3553(a).

"[D]istrict courts have extremely broad discretion when determining the weight to be given each of the § 3553(a) factors, and the fact that a variance sentence deviates, even significantly, from the Guidelines range does not alone render it presumptively unreasonable." *United States v. Nance*, 957 F.3d 204, 215 (4th Cir. 2020) (citation modified).

Consistent with this principle, in 2025, the Sentencing Commission amended the Guidelines Manual to remove departures and policy statements relating to specific personal characteristics. *See* U.S.S.G. App. C, amendment 836. The Commission made these changes "to better align the requirements placed on the court and acknowledge the growing shift away from the use of departures provided for within the Guidelines Manual in the wake of *Booker* and subsequent decisions." U.S.S.G. 2025 Guidelines Manual, Chapter One, Part A—Introduction and Authority, Introductory Comment.

The amendment revised the application instructions in §1B1.1 to reflect a two-step process whereby the sentencing court must first correctly calculate the applicable guideline range as the "starting point and initial benchmark" and then must determine an appropriate sentence upon consideration of all the factors set forth by Congress in 18 U.S.C. § 3553(a). *Id.* "After determining the kinds of sentence and guidelines range pursuant to subsection (a) of §1B1.1 (Application Instructions) and 18 U.S.C. § 3553(a)(4) and (5), *the court shall consider the other applicable*

*factors in 18 U.S.C. § 3553(a) to determine a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing.*" (emphasis added). *See* U.S.S.G. §1B1.1(b). Here, the section 3553(a) factors all point in the same direction: towards probation.

### A. The circumstances of the offense and Mr. Hao's characteristics support probation.

Because of the problems with the loss table, "a [c]ourt is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences." *Adelson*, 441 F. Supp. 2d at 515. The "particular circumstances" of this case support probation: Mr. Hao attempted to protect his investors, was hindered by impaired judgment, and sincerely regrets his mistakes. Mr. Hao's personal characteristics—his ethic of self-sacrifice, his hard work, and his generosity—likewise support probation.

### 1. Mr. Hao invested in good faith and attempted to protect investors.

Even though defendants can be guilty of fraud without intending to harm their victims, *see Kousisis v. United States*, 605 U.S. 114, 118 (2025), their intent is still relevant at sentencing, *see Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993) ("The defendant's motive for committing the offense is one important factor [in sentencing]."). "[I]t is not uncommon for a defendant to receive a minimum sentence because he was acting with good motives." *Id.* (quoting 1 W. LeFave & A. Scott, Substantive Criminal Law § 3.6(b), p. 324 (1986)).

Courts have thus granted sentences below the guideline range, including probation, in fraud cases because the defendant did not initially intend harm or later tried to prevent losses. *See Prosperi*, 686 F.3d at 46 ("[I]n distinguishing the defendants from other white-collar fraud defendants, the court emphasized the absence of an intent to harm" and imposed probation when the Guidelines called for 87 to 108 months.)*; cf. Ranum*, 353 F. Supp. 2d at 990 (varying downward

in misapplication of bank funds case because defendant "wanted [the debtor] to succeed so that it could repay the loans" and "made attempts to protect the bank" by hiring a law firm when the debtor defaulted); *United States v. Redemann*, 295 F. Supp. 2d 887, 899 (E.D. Wis. 2003) (recognizing that courts grant downward departures "when the defendant's effort to remedy the wrong merits consideration") (citation omitted).

Mr. Hao's intent supports a probationary sentence. Far from intending to defraud investors, he personally invested in Metronomic hoping to provide for his daughter's future. These investments were made in good faith, after four years and millions of dollars of successful projects with Metronomic. Though he commingled investors' funds, he kept meticulous records, with nearly 99% of investments going to their intended source (indeed, Mr. Hao's records allowed him to show the loss amount was vastly lower than the government initially alleged). Mr. Hao also tried to prevent losses. When Metronomic first delayed its payments to Qidian investors, Mr. Hao used his own money to make up the shortfall. And when Metronomic filed for bankruptcy, he hired and contributed his own money for two law firms—one for the bankruptcy and one to sue Mr. Trinidad—and sought a new institutional lender so he could restart the project and recoup their investments. The money and effort he used to shield Qidian investors support a sentence of probation. *See Mitchell*, 508 U.S. at 485; *Prosperi*, 686 F.3d at 46; *Ranum*, 353 F. Supp. 2d at 990.

### 2.      Mr. Hao's judgment was impaired.

Though Mr. Hao acted in good faith, his judgment was impaired. By the time he founded Qidian, Mr. Hao had not had anything close to a full night's sleep in a decade, waking up every few hours to care for his daughter Gabby. Prolonged periods of interrupted sleep—which

22

caregivers are especially prone to—impair judgment and increase impulsivity.[4] A sleep deficit "profoundly affects human functioning and its effects are so widespread that it is difficult to find functions that remain untouched."[5]

Further clouding his judgment, Mr. Hao's personal life collapsed at the same time as his professional endeavors. One month before Metronomic stopped paying Qidian, he and his wife divorced. Within six months, ████████████████████████████████████████ ████████. And one week before Metronomic filed for bankruptcy, his daughter died.

Mr. Hao continues to admit fault, to acknowledge that his intent does not absolve him of culpability, and to take responsibility for misappropriating investor funds. He only means to provide context to the Court: under other circumstances, he might have realized it was inappropriate to divert investors' funds and ill-advised to trust Mr. Trinidad. *Cf. United States v. Menyweather*, 447 F.3d 625, 631–32 (9th Cir. 2006) (affirming downward departure because defendant's mental condition "distorted Defendant's reasoning, interfered with her ability to make considered decisions, and contributed to the commission of the offense in some way") (citation modified).

### 3.    Mr. Hao's remorse is genuine.

Mr. Hao's acknowledgment of his mistakes comes from the heart—he is "committed to learning from [the past] and rebuilding [his] life with honesty, responsibility, and humility." Bin

---

[4]    *See* Goran Medic et al., S*hort- and long-term health consequences of sleep disruption*, 9 Nature and Science of Sleep 151, 153–55 (2017), https://www.dovepress.com/short--and-long-term-health-consequences-of-sleep-disruption-peer-reviewed-fulltext-article-NSS.

[5]    T.W. Boonstra et al., *Effects of sleep deprivation on neural functioning: an integrative review*, 64 Cell. Mol. Life 934, 936 (2007) (citation omitted). Though this quotation concerned prolonged periods with no sleep, rather than with interrupted sleep, the effects are virtually identical. *See id.* at 935.

Hao Letter at 2, Exhibit X. Even before this case began, he apologized to Qidian's investors. *See* February 2021 Letter at 6 ("First of all, I owe you an apology. . . . I failed to control investment risks and caused everyone to suffer losses. This is a betrayal of your trust."). "Since early 2020," Mr. Hao has "devoted nearly all of [his] financial resources, as well as [ ] physical and emotional energy, to trying to address the situation and its consequences," focusing on "what had happened and how it affected others." Hao Letter at 1.

From this case's inception, he has continued to take responsibility for his actions. Mr. Hao pled guilty and, consistent with his efforts to recover investor funds and sue Mr. Trinidad, he has been willing to cooperate with the government should it choose to investigate Mr. Trinidad. The government initially extended Mr. Hao a cooperation agreement, but it never followed up on the issue, even though Mr. Trinidad appears to have repeated the same pattern of delayed projects and unfulfilled promises.[6]

This Court has recognized Mr. Hao's acceptance of responsibility: earlier this year, it allowed him to travel to China to see his parents. PSR ¶ 51; Hao Letter at 1 ("I had not been able to see them for six years because I felt it was my responsibility to remain here and deal with the consequences of my decisions.").

His acceptance of responsibility and sincere remorse support a probationary sentence. *See United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (affirming sentence of probation partly because defendant "repented his crime" and "had, since his conviction, devoted himself to . . . building an honorable life"); *see also United States v. Beach*, 275 F. App'x. 529, 532–33 (6th Cir. 2008) (affirming downward variance partly because of defendant's remorse); *United States v.*

---

[6] *See* Nicholas Vercilla, *City Council Orders Developer to Fill Downtown Hole*, New Castle News (July 23, 2025), https://www.ncnewsonline.com/news/local_news/city-council-orders-developer-to-fill-downtown-hole/article_6e5a983b-2846-435d-af29-5ae545ce9f33.html.

*Taylor*, Crim. No. 3:15-00009, 2022 WL 1510546, at \*5 (S.D. W.Va. May 12, 2022) ("[The court] recognized the Defendant's sincere remorse and family obligations in granting a downward variance . . . ."); *United States v. Johnson*, No. CR 18-62, 2021 WL 719659, at \*1 (W.D. Pa. Feb. 24, 2021) ("In granting the variance, the Court took into consideration Defendant's early acceptance of responsibility, his showing of remorse, as well as his mental and emotional condition."); *United States v. Bleicher*, No. CR 19-99 (RBK), 2020 WL 2744606, at \*4 (D.N.J. May 27, 2020) ("[F]inding that Defendant had expressed genuine remorse, the Court granted a downward variance.").

### 4.   Mr. Hao is an extraordinary father and partner.

In considering the person behind the crime, a court may take their "family circumstances" into account. *Menyweather*, 447 F.3d at 634. Defendants have thus received downward variances because they are good parents. *See United States v. Pauley*, 511 F.3d 468, 474 (4th Cir. 2007) (affirming sentence 36 months below the guideline range partly because "[the defendant] was a good father"); *United States v. Howe*, 543 F.3d 128, 137 (3d Cir. 2008) (affirming downward variance to probation in fraud case partly because defendant "was a 'devoted husband, father, and son'"); *United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008) (affirming sentence 91 months below the guideline range partly because "[t]he record is replete with letters from family and friends attesting to the defendant's virtues as a father"); *Whitehead*, 532 F.3d at 993 (affirming sentence of probation where the defendant's "eight-year-old daughter depended on him" and "he doted on her"); *see also United States v. Worley*, 685 F.3d 404, 410 (4th Cir. 2012) ("[The district court] sentenced Worley at the low end of the guidelines range . . . [partly because] Worley appeared to be a good parent.").

A downward variance for family circumstances does not require that those circumstances be "extraordinary." *United States v. Johnson*, 126 F.4th 1000, 1009 (4th Cir. 2025) ("When a district court gives a sentence outside the Guidelines range, it does not necessarily need to find 'extraordinary' circumstances.") (quoting *Gall*, 552 U.S. at 47). Nevertheless, it is particularly appropriate when they are. *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) (citing authority from multiple circuits) ("Extraordinary family circumstances are widely accepted as a valid reason for departure."); *United States v. Colp*, 249 F. Supp. 2d 740, 744 (E.D. Va. 2003) ("This Court finds that Ms. Colp's family circumstances are 'exceptional' and that a departure from the Guidelines is warranted."). A defendant's role as a parent thus strongly supports a below-guidelines sentence when he "faced more than the responsibilities of an ordinary parent," *Johnson*, 964 F.2d at 129 (affirming downward departure to home confinement), or when his children would be "severely adversely affected" by his incarceration, *United States v. R.V.*, 157 F. Supp. 3d 207, 255 (E.D.N.Y. 2016) (departing downward to non-custodial sentence); *see United States v. Dantzler*, 791 F. Supp. 3d 1293, 1297 (M.D. Ala. 2025) ("The other significant factor the court must consider is the impact of a Guidelines sentence on Dantzler's children."); *see also United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (finding court did not err by departing downward to sentence in a half-way house based on defendant's support for his wife, children, and parents).

Few could deny that the circumstances here are extraordinary. For 16 years, Mr. Hao shouldered a far heavier burden than most parents. He slept no more than a few hours at a time so he could comfort his daughter Gabby, holding her against his chest and helping her back to sleep. Through that time, he supported his wife and "fought to provide" normalcy for all his children, taking them to the park when Gabby was well and inventing games at home when she wasn't. Yuan Letter at 2. He juggled parenting with working full time: "with Gabby held tightly in one arm [and]

managing his work calls with the other." Yuan Letter at 2. In his words, "being a father" is "[t]he most important part of my life." Hao Letter at 1. Mr. Hao's round-the-clock, committed parenting supports a sentence of probation. *See Worley*, 685 F.3d at 410; *Pauley*, 511 F.3d at 474; *Johnson*, 964 F.2d at 129.

Mr. Hao continues to devote himself to his children, providing emotional ballast through "I love you" messages to his teenagers and through lullabies to his unborn daughter. The void Mr. Hao's absence would leave in their lives also warrants probation. *See Dantzle*r, 791 F. Supp. 3d at 1297; *R.V.*, 157 F. Supp. 3d at 255; Hao Letter at 1 ("There have been moments when I looked at [my children] and felt the weight of knowing that my decisions had consequences for them as well.").

As does the support Mr. Hao receives from his fiancée Ms. Zhang and his ex-wife Ms. Yuan. *See* Hao Letter at 2 ("Despite everything, I have been fortunate to have the support of my family."); *United States v. Autery*, 555 F.3d 864, 868, 874 (9th Cir. 2009) (affirming probation instead of 41–51 month sentence partly because "[the defendant] enjoys the continuing support of his family, especially his wife and children"). He lives down the hall from Ms. Yuan, with whom he amicably coparents ████ and Sophia, and he plans to marry Ms. Zhang when this case resolves, hopefully in time for the birth of their daughter. PSR ¶¶ 54–55; Yuan Letter.

### 5.    Mr. Hao has a long history of hard work and good deeds.

Mr. Hao's devotion to his family and his efforts on behalf of the investors are in line with the rest of his character. Mr. Hao is an unstintingly hard worker, sacrificing himself for the sake of those around him. *See* Yuan Letter at 1–2; Zhang Letter at 1–2.

Courts regularly find that a defendant's otherwise worthy life, including a commendable history of education and employment, supports a sentence below the guideline range. *United States*

27

*v. Baker*, 445 F.3d 987, 992 (7th Cir. 2006) (affirming downward departure based on the defendant's "lack of a criminal history . . . and his history of both employment and higher education"); *United States v. Jagmohan*, 909 F.2d 61, 65 (2d Cir. 1990) (affirming sentence of probation based on the defendant's lack of criminal history, long record of employment, and the unusual circumstances of the offense); *United States v. Benkahla*, 501 F. Supp. 2d 748, 760 (E.D. Va. 2007) (varying downward from the Guideline range because " Defendant has never committed any criminal act outside the context of this case. . . . He attended a local high school and college, excelling at both, and received a Master's degree at The Johns Hopkins University."); *United States v. Caruso*, 814 F. Supp. 382, 384 (S.D.N.Y. 1993) (imposing below guideline sentence based on "the defendant's age, military service, medical problems, good employment record, and likely future compliance with the law").

Mr. Hao's efforts on behalf of those around him—whether they be his family, his friends, or homeless people in a cold winter—are thus grounds for a downward variance. *See United States v. Warner*, 792 F.3d 847, 858–59 (7th Cir. 2015) (affirming downward variance to probation based on moral character shown by good deeds); *United States v. Cooper*, 394 F.3d 172, 177–78 (3d Cir. 2005) (affirming below-guideline sentence for good deeds that were "personal and substantial," rather than merely a donation of money); *United States v. Russell*, 729 F. Supp. 3d 584, 597 (E.D. Va. 2024) (finding sentencing factors to support below-guideline sentence based on defendant's donation of time and money to his community).

### 6. The Court should give little weight to the victim impact statements, which are unreliable.

The Court should give little, if any, weight to the victim impact statements. Everything about them shows them to be unreliable.

First, and most significantly, they grossly overstate the impact on victims. The victims aver that they were harmed to the tune of hundreds of thousands of dollars. *See, e.g.*, Victim Impact Statements ("VIS") at 2, 5, 13.[7] Yet, the investors lost money not because Mr. Hao commingled their funds but because Metronomic failed. There is no evidence that misallocation of funds contributed to that failure. And, to the extent their losses are attributable to Mr. Hao, it would be in a far smaller amount. When a defendant commits fraud by commingling funds, then each contributor to those funds "loses a pro-rata share of her contribution." *Bartko*, 728 F.3d at 346. In other words, each victim's loss is based on their pro-rata share of this case's actual loss—around $450,000—and how much they contributed to the pool of investor money: nearly $40,000,000. *See* PSR ¶ 18 ("[T]he defendant acquired approximately $39,224,664.36 from investors."). So, a claimed $250,000 loss, *see* VIS at 15, is in fact closer to a $3,000 loss.[8] This lower figure tracks common sense: nearly 99% of investor money went to its intended source.

The victim impact statements are plagued by other problems. Some blame Mr. Hao for hardship that is even further removed from the offense conduct. *See* VIS at 12 (attributing mother's cancer to Mr. Hao); *id.* at 13 (attributing cerebral hemorrhage and consequences to Mr. Hao); *id.* at 51, 56 (attributing liver issues to Mr. Hao). Others fail to mention that the investors had reason to know of the risks they actually faced. *See id.* at 1, 3–4, 13–14, 22–24 (investors signed agreements acknowledging that the investment was high-risk); *id.* at 1, 22–24, 31–32 (investors had travelled to inspect the projects); *id.* at 13–14, 16–18, 31–32 (investors had connections to

---

[7]    The most recent version of the Victim Impact Statements, which the probation department sent the government and the defense on May 22, are not currently on the court's docket. This pagination reflects the most recent version, not the pagination of statements at ECF 14-1.

[8]    $250,000 is approximately 0.6% of the $39,224,664.36 invested. 0.6% of the $453,917.49 loss is $2,893.06.

Qidian or Metronomic).[9] Some make unsubstantiated allegations unrelated to the offense conduct. *See id.* at 28–29 (accusing Ms. Yuan of a 15-year-old fraud); *id.* at 30 (accusing Mr. Hao of fraudulent transfer). Others are belied by Mr. Hao's communications to investors and efforts to recover money on their behalf. *See id.* at 11 (alleging that Mr. Hao was not transparent with investors about delays); *id.* at 19 (alleging that Mr. Hao "has never acknowledged the harm he caused, nor offered any apology or attempt at restitution"). In light of these issues, the statements are worth discounting.

### B.    Probation is a just punishment for this offense.

Probation would also "reflect the seriousness of the offense" and "provide just punishment," 18 U.S.C. § 3553(a)(2)(A), as well as "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id.* § 3553(a)(6).

Sentences of probation "are quite oppressive given that probationers are 'subject to several standard conditions that substantially restrict their liberty.'" *United States v. Ruff*, 535 F.3d 999, 1004 (9th Cir. 2008) (quoting *Gall*, 552 U.S. at 48).

> Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, [and] refrain from associating with any person convicted of a felony . . . . Most probationers are also subject to individual "special conditions" imposed by the court.

*Gall*, 552 U.S. at 48 (citation omitted). Because of its myriad restrictions, probation—like incarceration—"serves a punitive function." U.S. Sent'g Comm'n, *Amendments to the Sentencing Guidelines (Preliminary)* 95 (Apr. 16, 2026), https://www.ussc.gov/sites/default/files/pdf/

---

[9]    These contradictions are not all apparent on the face of the statements. Some are based on Bin Hao's representations and on documentation that he has provided.

amendment-process/reader-friendly-amendments/202604_prelim-RF.pdf; *see also Gall*, 552 U.S. at 49 n.4 ("[P]robation is not merely letting an offender off easily.") (citation modified).

Courts have thus imposed probation in fraud cases with the same guideline range. *Menyweather*, 447 F.3d at 628 (guideline range of 21 to 27 months); *United States v. Goss*, 325 F. Supp. 3d 932, 936 (E.D. Wis. 2018) (same). Indeed, they have imposed probation when the guideline range and loss amount were higher than they are here. *Prosperi*, 686 F.3d at 34 (87 to 108 months and over $5 million loss); *United States v. Diambrosio*, No. CRIM. A. 04-66, 2008 WL 732031, at *1 n.1, *3 (E.D. Pa. Mar. 13, 2008) (46 to 57 months and almost $3 million loss); *see also Warner*, 792 F.3d at 850 (46 to 57 months for $5.6 million tax evasion); *United States v. Whitehead*, 532 F.3d 991, 992–93 (9th Cir. 2008) (41 to 51 months for $1 million in sales of counterfeit access cards); *United States v. Cole*, 765 F.3d 884, 885 (8th Cir.2014) (135 to 168 months and $33 million mail and wire fraud); *cf. Ruff*, 535 F.3d at 1001, 1003–04 (affirming variance downward from 30 to 37 months guideline range to one day sentence, with particularly stringent conditions of supervised release, for stealing $644,866 from medical center).

This case strongly resembles one of these cases, *Prosperi*, in which the defendants received probation despite committing a fraud over ten times larger than the one here. 686 F.3d at 34, 37. Among other factors, the district court noted that the defendants hadn't meant to harm their victims and that one of the defendants took care of his wife with cancer. *Id.* at 46–49. Similarly, Mr. Hao did not mean to harm Qidian investors; he invested in Metronomic thinking the investments would succeed, as had those in the past, and then endeavored to protect them and to recover their losses. And though Mr. Hao is no longer serving as the caregiver of a sick family member, he did so for well over a decade. He also helped raise his children while his ex-wife was sick with cancer, and he supports his fiancée, pregnant with their child due in August. *See* PSR ¶¶ 52, 55. This case

31

concerns a fraction of the loss in *Prosperi* and shares its mitigating factors. Probation is thus appropriate here as well.

The consequences Mr. Hao has already faced underscore that probation is a sufficient sentence. 18 U.S.C. § 3553(a). Mr. Hao has been permanently barred from serving as an officer or director of most public companies. *See Pauley*, 511 F.3d at 474 ("Pauley warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct."). He also has been marked a felon for life. A search for Mr. Hao's name on Google uncovers the SEC action against him as the first result and the FBI's investigation into him as the third. Regardless of when his sentence ends, this case will follow him—a fact that weighs in favor of probation. *See Cole*, 765 F.3d at 886 ("[T]he facts of Cole's fall from an industrious and highly successful entrepreneur to convicted felon and the loss of the bulk of her legitimately acquired assets cannot be denied."); *United States v. Gardellini*, 545 F.3d 1089, 1091 (D.C. Cir. 2008) (Kavanaugh, J.) (affirming probationary sentence where defendant cooperated with the government and "had already suffered substantially due to his prosecution") (citation modified); *Redemann*, 295 F. Supp. 2d at 895–97 (finding that financial penalty, loss of former career, and unfavorable publicity "resulted in satisfaction of several of the purposes of sentencing, allowing mitigation of his punishment under the guidelines").

This case's financial burden will also trail Mr. Hao indefinitely. Mr. Hao has agreed to pay restitution that equals the loss amount. PSR ¶ 7. Even if he could devote his entire $1,000 of monthly income to that end—which he cannot: he has "a negative net worth," and his basic expenses exceed his income, PSR ¶¶ 71–73—it would still take him nearly four decades to pay. Mr. Hao could well be burdened with restitution obligations for the rest of his life, making probation a severe enough punishment. *See Adelson*, 441 F. Supp. 2d at 514 ("Adelson will be

making substantial restitution payments for the rest of his life. So far as monetary sanctions are concerned, therefore, the Court did indeed impose a life sentence.").

### C. Probation will achieve deterrence, protect the public, and facilitate repayment.

In imposing probation, courts have recognized that it may provide sufficient deterrence. *See United States v. Faiella*, No. 06-CR-335 (JBW), 2008 WL 4862455, at *2 (E.D.N.Y. Sept. 8, 2008) ("General deterrence is satisfied with the sentence imposed. The sentence will send a clear message that any involvement in financial crimes will result in a criminal prosecution. Specific deterrence is not required in light of the defendant's law abiding background."); *see also, e.g.*, *Prosperi*, 686 F.3d at 48. While Congress and the Sentencing Commission have hypothesized a need for general deterrence, in reality, "there is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders." Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448–49 (2007); *see also* Allenbaugh, *supra*, at 19 (describing how Congress' decisions were "without regard to the Commission's own research and reforms"). As for specific deterrence, "[t]he weight of the research indicates that incarceration—imposing it at all or increasing the amount imposed—either has no significant correlation to recidivism or *increases* the defendant's likelihood to recidivate. . . . This trend obtains even for white-collar criminals." *United States v. Courtney*, 76 F. Supp. 3d 1267, 1304 n.13 (D.N.M. 2014) (collecting sources) (emphasis in original). For offenders like Mr. Hao, recidivism is unlikely: a 2004 Sentencing Commission study showed that for male offenders with no criminal history, the recidivism rate was under 10% if they were over 50 (6.2%), if they had

been married (9.8%), or if they had been convicted of fraud (9.3%).[10] Beyond the data, Mr. Hao's strong family ties—to his partner, his ex-wife, and two (soon to be three) children—make recidivism even more unlikely.

With recidivism so improbable, incarceration is not needed to protect the public. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("[T]he need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant.") (internal quotation marks and citation omitted). To the extent that the Court has any concerns, it can alleviate them through conditions of probation or supervised release. *See Menyweather*, 447 F.3d at 636 ("The nature of the offense was not such that incarceration, as distinct from strict controls on Defendant's financial activities, was necessary to protect the public or afford deterrence.").

Probation will also make it easier to pay restitution. Given the significant impact that his conviction has had on his employment prospects, Mr. Hao needs every month to earn income and seek better work. Incarceration, by contrast, would take him out of the workforce and make it even harder for him to find a job when he returns. *See Ruff*, 535 F.3d at 1002 (affirming downward variance so that defendant could "participate in work release to help pay restitution"); *Menyweather*, 447 F.3d at 636 ("[A] sentence of probation may have made Defendant better able to provide restitution to the victims of her crime."); *United States v. Coleman*, 370 F. Supp. 2d 661, 681 (S.D. Ohio 2005) (sentence of probation "will afford Defendants more time to pay restitution").

---

[10]    *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 28–30 (2004), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

34

Should the Court determine that probation is inappropriate, a sentence substantially below the guideline range would also serve these purposes, given the impact of even a short sentence on a first-time, white-collar offender. *See, e.g.*, *United States v. Baker*, 445 F.3d 987, 992–93 (7th Cir. 2006) (affirming a sentence 20 months below the guideline range, in part because "a prison term would mean more to Mr. Baker than to a defendant who previously had been imprisoned"); *Adelson*, 441 F. Supp. 2d at 514 ("[T]here is [ ] considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders.") (citing Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485, 492 (1998)).

### III.    The Court Should Not Impose a Fine.

The PSR states that Mr. Hao may be punished with a fine of up to $250,000. PSR at 1. But the statute Mr. Hao was convicted under does not require a fine. *See* 18 U.S.C. § 1343 (". . . shall be fined under this title or imprisoned not more than 20 years, or both."). And, even if a fine were appropriate, the Guidelines would recommend one substantially lower than $250,000. *See* U.S.S.G. § 5E1.2(c)(3).

Regardless, a fine is not appropriate, because Mr. Hao "cannot pay the minimum fine . . . or any interest in any fine." PSR ¶ 71; *see* U.S.S.G. § 5E1.2(a), (e) (permitting the Court to waive the fine where the defendant is unable to pay). Mr. Hao has drained his life savings, has filed for bankruptcy, and is currently making only $1,000, which does not cover his basic monthly expenses. PSR ¶¶ 71–73. Until recently, he had been largely unemployed for three years. Going forward, he is barred from finance jobs similar to those he has held in the past. Being labeled a felon will surely make his job prospects even worse. Despite his financial situation, he will need to pay significant

35

restitution. Considering these financial hardships and the sentencing factors, *see* U.S.S.G. § 5E1.2(d), the Court should waive imposition of a fine.

## CONCLUSION

The Court should impose a sentence of probation, or otherwise vary significantly below the sentence recommended by the U.S. Sentencing Guidelines. It should also waive any fine.

Respectfully submitted,

By: */s/ Eugene V. Gorokhov*
Eugene Gorokhov, Va. Bar No. 73582
*Attorney for defendant Bin Hao*
GOROKHOV P.C.
BURNHAM & GOROKHOV
1634 I Street NW, Suite 575
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com


Nina J. Ginsberg, Va. Bar No. 19472
Attorney for defendant Bin Hao
GREENSPUN, SHAPIRO GINSBERG
& YANG PC
3955 Chain Bridge Road
Second Floor
Fairfax, Virginia 22030
(703) 352-0100 (phone)
(703) 591-7268 (fax)
njg@greenspunlaw.com

**CERTIFICATE OF SERVICE**

I certify that on May 27, 2026, a redacted copy of the foregoing Position on Sentencing was filed with the Clerk of Court via ECF, which automatically sends a copy to all counsel of record. I further certify that I have provided a copy of the unredacted version of this document to the Court's chambers and to counsel for the government.

Respectfully submitted,

By: */s/ Eugene V. Gorokhov*
Eugene Gorokhov, Va. Bar No. 73582
*Attorney for defendant Bin Hao*
GOROKHOV P.C.
BURNHAM & GOROKHOV
1634 I Street NW, Suite 575
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com

Nina J. Ginsberg, Va. Bar No. 19472
Attorney for defendant Bin Hao
GREENSPUN, SHAPIRO GINSBERG
& YANG PC
3955 Chain Bridge Road
Second Floor
Fairfax, Virginia 22030
(703) 352-0100 (phone)
(703) 591-7268 (fax)
njg@greenspunlaw.com

37